**[Cite as *In re R.M.*, 2026-Ohio-2472.]**

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

IN RE:

    **C.M.,**

**ADJUDICATED DEPENDENT CHILD.**

**[CHRISTOPHER M. - APPELLANT]**
**[RAYCHEL M. - APPELLANT]**

**CASE NO. 9-26-01**

**OPINION AND
JUDGMENT ENTRY**


IN RE:

    **K.M.,**

**ADJUDICATED DEPENDENT CHILD.**

**[CHRISTOPHER M. - APPELLANT]**
**[RAYCHEL M. - APPELLANT]**

**CASE NO. 9-26-02**

**OPINION AND
JUDGMENT ENTRY**


IN RE:

    **R.M.,**

**ADJUDICATED DEPENDENT CHILD.**

**[CHRISTOPHER M. - APPELLANT]**
**[RAYCHEL M. - APPELLANT]**

**CASE NO. 9-26-03**

**OPINION AND
JUDGMENT ENTRY**

Case Nos. 9-26-01, 02, 03, 04

IN RE:

    A.M.,

ADJUDICATED DEPENDENT CHILD.

[CHRISTOPHER M. - APPELLANT]
[RAYCHEL M. - APPELLANT]

CASE NO. 9-26-04

OPINION AND
JUDGMENT ENTRY

Appeals from Marion County Common Pleas Court
Family Division
Trial Court Nos. 2024 AB 0077, 2022 AB 0144, 2022 AB 0142
and 2022 AB 0143

Judgments Affirmed

Date of Decision:  June 29, 2026

APPEARANCES:

    *Paul L. Scarsella* for Appellant Christopher M.

    *William T. Cramer* for Appellant Raychel M.

    *Thomas J. Smith* for Appellee

ZIMMERMAN, P.J.

{¶1} Mother-appellant, Raychel M. ("Raychel"), and father-appellant, Christopher M. ("Christopher"), appeal the December 5, 2025 decisions of the

Marion County Court of Common Pleas, Family Division, granting permanent custody of their minor children—R.M, A.M., K.M., and C.M.—to Marion County Children Services (the "agency"). For the reasons that follow, we affirm.

{¶2} The underlying proceedings commenced on August 16, 2022, when the agency filed complaints in the trial court alleging that the three oldest children—R.M. (born in 2020), A.M. (born in 2021), and K.M. (born in 2022)—were dependent children. The complaints were prompted by Raychel's and Christopher's respective arrests for domestic violence. Following the commencement of the cases, the trial court appointed a guardian ad litem ("GAL") and a court appointed special advocate ("CASA") to represent the children's interests throughout the pendency of the proceedings.

{¶3} Later, on October 17, 2022, the agency amended the complaints to add neglect allegations tied to parental drug use, and the children were placed in the care of a relative.

{¶4} Because the statutory 90-day time limit elapsed, the trial court dismissed the amended complaints, and the agency refiled them on December 7, 2022. The relative was ultimately unable to continue caring for the children, and they were temporarily returned to Raychel's physical custody on December 26, 2022. However, the 90-day time limit again elapsed, resulting in another dismissal and the agency's refiling of the complaints on March 21, 2023.

{¶5} Following an adjudicatory hearing on May 1, 2023, the trial court's magistrate adjudicated the children dependent. Shortly thereafter, on May 30, 2023, the agency requested emergency temporary custody of R.M, A.M., and K.M. after receiving notification from law enforcement that Raychel had potentially overdosed and tested positive for illegal drugs. The trial court granted emergency temporary custody of the children to the agency the following day. Subsequently, after a dispositional hearing on June 8, 2023, the trial court's magistrate granted the agency temporary custody of the children. The trial court adopted the magistrate's decisions on July 18, 2023.

{¶6} The youngest child, C.M., was born in August 2023. The agency filed a dependency complaint regarding C.M. on August 15, 2023, but later dismissed it on February 20, 2024.

{¶7} On April 4, 2024, the trial court issued entries returning custody of R.M., A.M., and K.M. to Raychel under the protective supervision of the agency. However, on May 14, 2024, the agency filed motions requesting emergency temporary custody of all four children after receiving reports of active drug use in the home and subsequent drug screens revealing that both the parents and three of the children tested positive for illegal drugs. The trial court granted the emergency custody motions.

{¶8} Following the children's removal, the agency filed a new complaint on May 16, 2024, alleging C.M. to be a dependent child, and the trial court formally

adjudicated C.M. dependent on July 22, 2024. On September 19, 2024, the trial court held a dispositional hearing, ordering that all four children remain in the temporary custody of the agency.

{¶9} The trial court held several review hearings during the proceedings, consistently approving the agency's case plans, incorporating subsequent amendments, and determining that the agency was making the requisite reasonable efforts toward reunification.

{¶10} On May 30, 2025, the agency filed motions seeking permanent custody of the children. The GAL and CASA filed reports on September 16 and 23, 2025, respectively, both recommending that the trial court grant the agency's motions.

{¶11} Throughout the pendency of the cases, Christopher was repeatedly incarcerated for various offenses and, at the time of the permanent custody hearings, was residing at a transitional halfway house.

{¶12} After hearings on September 30 and October 24, 2025, the trial court granted permanent custody of R.M., A.M., K.M., and C.M. to the agency on December 5, 2025. The trial court found, by clear and convincing evidence, that permanent custody was warranted under R.C. 2151.414(B)(1)(d) as to the three oldest children and, alternatively, under R.C. 2151.414(B)(1)(a) as to all four children. The trial court further found that granting permanent custody to the agency was in the children's best interest.

{¶13} Raychel and Christopher filed their notices of appeal on December 31, 2025. Raychel raises a single assignment of error, while Christopher raises three assignments of error for our review. For ease of discussion, we will address Raychel's sole assignment of error together with Christopher's first and second assignments of error, followed by Christopher's third assignment of error.

**Raychel's Assignment of Error**

**The court's decision to grant permanent custody was not supported by the weight of the evidence.**

**Christopher's First Assignment of Error**

**The Trial Court Erred In Finding By Clear And Convincing Evidence That The Children Could Not Be Placed With Father Within A Reasonable Time Or Should Not Be Placed With Father Pursuant to R.C. 2151.414(E).**

**Christopher's Second Assignment of Error**

**The Trial Court Erred In Finding By Clear And Convincing Evidence That Permanent Custody Was In The Children's Best Interests Pursuant to R.C. 2151.414(D).**

{¶14} In Raychel's sole assignment of error and Christopher's first and second assignments of error, the parents argue that the trial court erred by granting permanent custody of R.M., A.M., K.M., and C.M. to the agency. In his first assignment of error, Christopher challenges the evidence supporting the trial court's finding that the children cannot or should not be placed with him within a reasonable time, specifically contesting the trial court's application of the R.C. 2151.414(E) factors. Furthermore, in Christopher's second assignment of error and Raychel's

sole assignment of error, both parents argue that the trial court's determination that granting permanent custody to the agency was in the children's best interests under R.C. 2151.414(D) is against the manifest weight of the evidence.

*Standard of Review*

{¶15} The proper appellate standard of review in permanent custody cases is either sufficiency of the evidence or manifest weight of the evidence, depending on the specific arguments raised by the appellant. *In re Z.C.*, 2023-Ohio-4703, ¶ 18. Sufficiency of the evidence concerns whether the evidence is legally adequate to support the trial court's findings. *Id.* at ¶ 13. Manifest weight of the evidence requires the appellate court to weigh the evidence and reasonable inferences, consider witness credibility, and determine whether the factfinder clearly lost its way, creating a manifest miscarriage of justice requiring that the judgment must be reversed and a new trial ordered. *Id.* at ¶ 14. *See also In re A.E.*, 2014-Ohio-4540, ¶ 28 (3d Dist.) ("A court's decision to terminate parental rights will not be overturned as against the manifest weight of the evidence if the record contains competent, credible evidence by which a court can determine by clear and convincing evidence that the essential statutory elements for a termination of parental rights have been established.").

*Analysis*

{¶16} The right to raise one's child is a basic and essential right. *In re Murray*, 52 Ohio St.3d 155, 157 (1990). "Parents have a 'fundamental liberty

interest' in the care, custody, and management of the child." *Id.*, quoting *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). However, the rights and interests of a natural parent are not absolute. *In re Thomas*, 2003-Ohio-5885, ¶ 7 (3d Dist.). These rights may be terminated under appropriate circumstances and when the trial court has met all due process requirements. *In re Leveck*, 2003-Ohio-1269, ¶ 6 (3d Dist.).

{¶17} When considering a motion for permanent custody of a child, the trial court must comply with the statutory requirements set forth in R.C. 2151.414. *In re C.E.*, 2009-Ohio-6027, ¶ 14 (3d Dist.). R.C. 2151.414(B)(1) establishes a two-part test for courts to apply when determining whether to grant a motion for permanent custody: (1) the trial court must find that one of the circumstances in R.C. 2151.414(B)(1)(a)-(e) applies, and (2) the trial court must find that permanent custody is in the best interest of the child. *In re S.G.*, 2015-Ohio-2306, ¶ 10 (9th Dist.). R.C. 2151.414(B)(1) provides, in relevant part, that a trial court

> may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that . . .
>
> (a) The child is not abandoned or orphaned, has *not* been in the temporary custody of one or more public children services agencies . . . for twelve or more months of a consecutive twenty-two-month period . . . and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
>
> . . .

(d) The child has been in the temporary custody of one or more public children services agencies . . . for twelve or more months of a consecutive twenty-two-month period . . . .

R.C. 2151.414(B)(1)(a), (d). *See In re A.W.*, 2017-Ohio-7786, ¶ 17 (9th Dist.) (noting "that the five factors listed in R.C. 2151.414(B)(1)(a)-(e) are alternative findings, and that the agency need only prove one in order to satisfy the first prong of the permanent custody test").

{¶18} "Prior to making a finding that a child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents, the statute directs the trial court to consider all the relevant factors listed in R.C. 2151.414(E)." *In re Dn.R.*, 2020-Ohio-6794, ¶ 38 (3d Dist.). That statute directs a trial court, in relevant part, to determine that a child cannot be placed with either parent within a reasonable time or should not be placed with either parent if "[t]he parent is repeatedly incarcerated, and the repeated incarceration prevents the parent from providing care for the child" or "[a]ny other factor the court considers relevant." R.C. 2151.414(E)(13), (16).

{¶19} Under the second step of the analysis, "[i]f the trial court determines that *any* provision enumerated in R.C. 2151.414(B)(1) applies, the trial court must determine, by clear and convincing evidence, whether granting the agency permanent custody of the child is in the child's best interest." (Emphasis in original.) *In re A.F.*, 2012-Ohio-1137, ¶ 55 (3d Dist.). "In determining the best interest of a child, a juvenile court 'may apply one of two different tests.'" *In re*

*S.C.*, 2022-Ohio-356, ¶ 38 (10th Dist.), quoting *In re J.P.*, 2019-Ohio-1619, ¶ 39 (10th Dist.). "'Under R.C. 2151.414(D)(1), the juvenile court weighs multiple factors . . . to decide whether granting an agency permanent custody of a child is in that child's best interest.'" *Id.*, quoting *In re J.P.* at ¶ 39. "By contrast, 'under R.C. 2151.414(D)(2), if the juvenile court makes [each of] the four enumerated findings, permanent custody is per se in the child's best interest and the court "shall" commit the child to the permanent custody of the agency.'" *Id.*, quoting *In re J.P.* at ¶ 39. "These two provisions 'are *alternative* means for reaching the best-interest determination,' and '[w]here a juvenile court employs the R.C. 2151.414(D)(1) [multiple factor weighing] method of determining the child's best interest, the court need not also conduct the R.C. 2151.414(D)(2) [four-requisite prong] analysis.'" (Emphasis added.) *Id.*, quoting *In re J.P.* at ¶ 40.

{¶20} In determining whether granting the agency permanent custody is in the best interest of the child, R.C. 2151.414(D)(1) provides:

> [T]he court shall consider all relevant factors, including, but not limited to, the following:
>
> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period . . . ;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1)(a)-(e).

{¶21} "Under R.C. 2151.414(B)(1), [a] juvenile court may grant permanent custody of a child to the agency that moved for permanent custody if the court determines, 'by clear and convincing evidence, that it is in the best interest of the child' to do so and that any of five factors enumerated in R.C. 2151.414(B)(1)(a) through (e) applies." *In re Z.C.*, 2023-Ohio-4703, at ¶ 7. "Clear and convincing evidence is that which is sufficient to produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." *In re S.G.*, 2015-Ohio-2306, at ¶ 10 (9th Dist.).

{¶22} In granting permanent custody to the agency, the trial court made alternative findings under the first prong of the permanent-custody test. As to the three oldest children—R.M., A.M., and K.M.—the trial court found that they had been in the agency's temporary custody for twelve or more months of a consecutive twenty-two-month period, satisfying R.C. 2151.414(B)(1)(d). Furthermore, the trial court independently found under R.C. 2151.414(B)(1)(a) that all four children—

-11-

including C.M.—could not or should not be placed with either parent within a reasonable time.

{¶23} Raychel does not challenge these first-prong findings on appeal, effectively conceding that permanent custody was warranted under both R.C. 2151.414(B)(1)(a) and (B)(1)(d). Therefore, since the statute requires a finding under only one of the R.C. 2151.414(B)(1) subdivisions, the first prong of the permanent-custody test is satisfied as to Raychel. *See In re B.J.P.*, 2018-Ohio-5221, ¶ 15 (3d Dist.).

{¶24} Unlike Raychel, Christopher's first assignment of error challenges the trial court's finding under R.C. 2151.414(B)(1)(a). Because the youngest child, C.M., did not meet the twelve-month threshold for the (B)(1)(d) finding, the trial court's determination for her relies on its alternative finding under R.C. 2151.414(B)(1)(a). Thus, since our analysis of Christopher's first assignment of error requires us to review the trial court's R.C. 2151.414(B)(1)(a) finding concerning C.M., for ease of discussion, we will review his challenges to this finding as they apply to all four children.

{¶25} In concluding that the children could not or should not be placed with Christopher within a reasonable time, the trial court applied R.C. 2151.414(E)(13) based on his history of repeated incarceration, and alternatively found that placement with him was inappropriate under R.C. 2151.414(E)(16). On appeal, Christopher challenges this determination. However, because a finding under R.C.

2151.414(B)(1)(a) is satisfied if the trial court properly determines that *one* of the factors in R.C. 2151.414(E) applies, we will limit our discussion to R.C. 2151.414(E)(13). *See In re C.J.*, 2017-Ohio-8612, ¶ 17 (6th Dist.).

{¶26} The trial court properly applied R.C. 2151.414(E)(13) to Christopher, finding that his repeated incarceration prevented him from providing care for the children. Indeed, the record reflects that, since 2022, Christopher has been booked into jail eight times, resulting in approximately seventeen months of incarceration during the pendency of these cases. In particular, Jamie Eshy ("Eshy"), the agency caseworker, testified to the disruption in visitation and services caused by Christopher's incarceration—a reality Christopher acknowledged at the permanent custody hearing. Christopher further admitted that his incarceration following C.M.'s birth impeded his ability to establish a parental bond with her.

{¶27} Although Christopher argues that he was sober and progressing in his program, the trial court was entitled to prioritize his extensive history of repeated incarceration, which the statute expressly identifies as a factor in determining parental incapacity. *See In re L.S.*, 2021-Ohio-510, ¶ 47-48 (8th Dist.) (recognizing under R.C. 2151.414(E)(13) that a parent's repeated incarceration preventing them from providing care is a statutory factor weighing against reunification). Moreover, Christopher's residence in a transitional halfway house is not an appropriate independent placement for four young children. *See In re P.S.*, 2016-Ohio-3489, ¶ 50-51 (5th Dist.). Accordingly, competent, credible evidence supports the trial

court's finding that Christopher's repeated incarceration prevented him from providing care, warranting the conclusion that the children could not or should not be placed with him within a reasonable time. *See In re C.J.* at ¶ 17. Therefore, the trial court properly concluded that one of the necessary provisions of R.C. 2151.414(B)(1) was met in these cases.

{¶28} Having resolved that the trial court did not err by concluding that one provision of R.C. 2151.414(B)(1) applies in these cases, we next address the trial court's best-interest determination under R.C. 2151.414(D)(1). On appeal, both Raychel and Christopher contend that the trial court's best-interest findings are against the manifest weight of the evidence. Specifically, Raychel argues that she demonstrated substantial compliance with her case plan, pointing to her sobriety during portions of the case and her ongoing engagement in services as evidence that she could provide a stable, legally secure home for the children. Similarly, Christopher argues that the trial court failed to adequately weigh his recent sobriety and his participation in programming while at the halfway house, maintaining that these efforts demonstrate an ability to provide for the children's needs. Both parents assert that, in light of these efforts, the trial court erred by concluding that the children's best interest is served by granting permanent custody to the agency rather than exploring other custodial alternatives.

{¶29} Regarding the best-interest factor under R.C. 2151.414(D)(1)(a), the trial court considered the children's interaction and interrelationship with their

parents, siblings, relatives, and foster caregivers. Relevantly, the trial court focused on the children's experience during visitations, noting that their interactions with Raychel and Christopher were frequently chaotic. *Compare In re M.A.*, 2021-Ohio-948, ¶ 12 (8th Dist.) (affirming the trial court's R.C. 2151.414(D)(1)(a) finding where the record demonstrated that "visits were chaotic"). Indeed, the record reflects that the parents frequently brought inappropriate amounts of junk food to the visits and required ongoing coaching from visitation supervisors. The trial court highlighted that the children exhibited behavioral regressions and acted out following these visits, demonstrating that the interactions negatively affected them. *See In re A.S.*, 2019-Ohio-342, ¶ 17 (5th Dist.) (considering evidence that the child "shows regression and aggression" during environmental changes as part of its R.C. 2151.414(D)(1)(a) best-interest analysis).

{¶30} Further, the trial court noted that the children are bonded with their foster caregivers, who expressed a willingness to adopt them. *Accord In re A.P.*, 2024-Ohio-5639, ¶ 13 (3d Dist.) (supporting the R.C. 2151.414(D)(1)(a) analysis with the trial court's finding that the child "was bonded with the foster family"). The trial court also considered that potential kinship placements were ultimately unsuccessful, as one disrupted due to financial constraints and another was denied because the kinship placement could not meet the necessary requirements to provide adequate care for the children. *See In re C.H.*, 2022-Ohio-1139, ¶ 49 (3d Dist.) (recognizing that a history of unsuccessful kinship placements supports a trial

court's findings under R.C. 2151.414(D)(1)(a)). Consequently, the record supports the trial court's determination that R.C. 2151.414(D)(1)(a) weighs in favor of granting permanent custody to the agency.

{¶31} Regarding R.C. 2151.414(D)(1)(b)—the children's wishes—the children were ages five, four, three, and two at the time of the permanent custody hearing. On appeal, Raychel argues that this factor should weigh against permanent custody because the oldest child, R.M., expressed a desire to Eshy to be returned to her parents. Even though Eshy testified regarding R.M.'s wishes, the trial court specifically noted in its judgment entry that the two older girls were reluctant to speak with the GAL regarding their wishes.

{¶32} Notwithstanding Eshy's testimony and the older children's reluctance to engage with the GAL, the totality of the circumstances reflects that the trial court properly considered the children's wishes through the assessments provided by the GAL and CASA reports, which demonstrate that the children were too young or immature to express their wishes. Importantly, where children are unable to directly express their desires due to their tender age or immaturity, a trial court adequately considers R.C. 2151.414(D)(1)(b) by relying on the reports and recommendations of the children's court-appointed advocates. *See In re L.L.*, 2020-Ohio-1565, ¶ 29 (3d Dist.). Consequently, the trial court appropriately considered the GAL's and CASA's reports and recommendations, both of which advocated that granting permanent custody to the agency was in the children's best interests. *Accord In re*

*J.H.*, 2026-Ohio-1333, ¶ 22 (3d Dist.) (affirming the trial court's reliance on the GAL's recommendation in favor of permanent custody where the child was unable to articulate his wishes to the court).

{¶33} Concerning R.C. 2151.414(D)(1)(c)—the children's custodial history—the trial court found that this factor weighed in favor of permanent custody. Specifically, the trial court found that the three oldest children had been in the temporary custody of the agency for approximately 19 months of a consecutive 22-month period. The trial court additionally noted that the youngest child, C.M., had been in the agency's custody for over 10 months by the time the permanent custody motion was filed, which represented roughly half of her entire life.

{¶34} On appeal, Christopher does not dispute the trial court's mathematical calculation of the time that the children spent in the custody of the agency. Instead, he argues that the custodial history factor should not mandate permanent severance because the children's brief return to Raychel in March 2024 demonstrates that family placement was achievable. He contends that the subsequent removal reflects setbacks tied primarily to Raychel's conduct, rather than his own permanent parental incapacity. The record contradicts Christopher's argument.

{¶35} "R.C. 2151.414(D)(1)(c) permits a court to review the broader custodial history of the child." *In re M.W.*, 2020-Ohio-5199, ¶ 30 (10th Dist.). "While the trial court may consider additional facts beyond the 12-out-of-22

circumstance in its analysis under R.C. 2151.414(D)(1)(c), the court is under no obligation to do so." *Id.*

{¶36} Although the children were briefly returned to Raychel's custody under protective supervision in March 2024, the reunification quickly deteriorated. By May 2024, the agency received reports of drug use in the home, and subsequent screenings confirmed that Raychel, Christopher, and three of the four children tested positive for illegal drugs. This evidence undermines Christopher's assertion that the resulting instability was primarily attributable to Raychel's actions. Notably, after the May 2024 removal, Christopher persisted in testing positive for drugs, experienced multiple incarcerations, and engaged in ongoing domestic conflicts with Raychel, which ultimately culminated in his most recent incarceration.

{¶37} Thus, rather than demonstrating achievable family placement, the children's custodial history illustrates a prolonged pattern of instability, multiple removals, disrupted reunifications, and extended time spent in foster care since the agency's initial involvement in 2022 as a direct result of both Raychel's and Christopher's conduct. Accordingly, the trial court properly evaluated the children's custodial history under R.C. 2151.414(D)(1)(c) and appropriately weighed this factor in favor of granting permanent custody.

{¶38} As to R.C. 2151.414(D)(1)(d)—the children's need for a legally secure permanent placement—the trial court determined that the children required consistent, stable caregiving that could not be accomplished without an award of

permanent custody to the agency. The trial court emphasized that, based on their tender ages, the children were in a critical developmental stage and could not protect themselves from the domestic violence, drug abuse, and housing instability that permeated the parents' home.

{¶39} On appeal, both parents contend that a legally secure placement could be achieved without permanently severing their parental rights. Christopher points to his sustained sobriety in 2025, completion of case plan services, and his impending release from the transitional halfway house, arguing that he is on the cusp of community reintegration and housing stability. Similarly, Raychel argues that she has actively addressed her addiction by entering a sober-living facility and complying with drug court programming, asserting that reunification is feasible within a reasonable time.

{¶40} "A 'legally secure placement' under R.C. 2151.414(D)(1)(d) means a safe, stable, consistent environment where [the child's] needs will be met." *In re R.R.*, 2023-Ohio-2575, ¶ 35 (6th Dist.), quoting *In re T.J.*, 2021-Ohio-4085, ¶ 59 (6th Dist.). "[T]he permanent custody statutes do not contemplate leaving children in custodial limbo for an extended period of time while a parent attempts to establish that the parent can provide the child with a legally secure permanent placement." *In re Z.M.*, 2019-Ohio-2564, ¶ 34 (4th Dist.). *See also* R.C. 2151.415(D)(4) (prohibiting court from granting "an agency more than two extensions of temporary custody" and from ordering "an existing temporary custody order to continue

beyond two years after the date on which the complaint was filed or the child was first placed into shelter care, whichever date is earlier, regardless of whether any extensions have been previously ordered"). "Additionally, keeping children in limbo is not in their best interests." *In re Z.M.* at ¶ 34.

{¶41} While the parents have made recent strides in their respective recoveries, the record demonstrates that neither parent was in a position to provide a legally secure placement at the time of the permanent custody hearing. Critically, neither parent possessed independent, stable, and appropriate housing for the family. Indeed, at the time of the permanent custody hearing, Christopher was residing in a transitional halfway house and Raychel was living in a rehabilitation facility— locations where the children are expressly prohibited from residing. Accordingly, the trial court was under no obligation to leave the children in ongoing custodial limbo while the parents attempt to secure independent housing and demonstrate long-term stability. *Compare id.* (concluding that "the trial court had no obligation to continue to hold the children in custodial limbo while the mother attempted to show, once again, that she could complete a treatment program and remain drug-free").

{¶42} Moreover, "it is generally accepted that a trial court is not limited to considering only current compliance with case plan objectives or objectives related to housing and income in its analysis of the child's need for a legally secure permanent placement." *In re W.J.*, 2022-Ohio-2449, ¶ 72 (3d Dist.). Indeed,

"[s]ubstantial compliance with a case plan is not necessarily dispositive on the issue of reunification and does not preclude a grant of permanent custody to a children's services agency." *In re W.C.J.*, 2014-Ohio-5841, ¶ 46 (4th Dist.). "The focal point is whether the parent has remedied the underlying conditions that caused the removal in the first place." *In re B.L.*, 2025-Ohio-4320, ¶ 27 (3d Dist.).

{¶43} Here, the record demonstrates that Christopher and Raychel failed to remedy the core behavioral issues that necessitated the agency's involvement. Importantly, despite completing domestic violence classes, ongoing volatility and threats persisted between the parents, culminating in a recent court-issued no-contact order. *Compare id.* (assessing that "the trial court found that, despite participating in services, [mother] failed to remedy her poor parenting skills and mental health issues").

{¶44} In sum, the children's paramount need for permanency and long-term stability outweighs the speculative hope that the parents might eventually become stable after three years of agency involvement. *See In re Dn.R.*, 2020-Ohio-6794, ¶ 52 (3d Dist.) (affirming permanent custody and determining that a child's need for a legally secure permanent placement is paramount, outweighing the parents' bond, their participation in services, and the speculative success of last-minute efforts to achieve stability). Consequently, Raychel's and Christopher's reliance on partial case plan compliance, visitation logs, and recent periods of structured sobriety do not outweigh the trial court's conclusion that a legally secure placement could not

be achieved without a grant of permanent custody to the agency. Therefore, we conclude that the trial court's determination that the children need a legally secure permanent placement that cannot be achieved without granting the agency's motion is supported by competent, credible evidence.

{¶45} Finally, with respect to R.C. 2151.414(D)(1)(e)—whether any of the factors in R.C. 2151.414(E)(7)-(11) apply—the trial court found that none of these factors were present in these cases.

{¶46} For these reasons, based on the totality of the evidence, we conclude that the trial court's determination that it is in the children's best interest to grant the agency's motions for permanent custody is supported by competent, credible evidence. Therefore, the trial court's decision granting permanent custody of the children to the agency is not against the manifest weight of the evidence.

{¶47} Raychel's assignment of error and Christopher's first and second assignments of error are overruled.

**Christopher's Third Assignment of Error**

**The Trial Court Erred In Finding That The Agency Made Reasonable Efforts Toward Reunification With Father.**

{¶48} In his third assignment of error, Christopher argues that the trial court erred by granting permanent custody of R.M., A.M., K.M., and C.M. to the agency because the agency failed to make reasonable efforts toward reunification.

*Standard of Review*

**{¶49}** "We review under an abuse-of-discretion standard a trial court's finding that an agency made reasonable efforts toward reunification." *In re A.M.*, 2015-Ohio-2740, ¶ 24 (3d Dist.). An abuse of discretion suggests the trial court's decision is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

*Analysis*

**{¶50}** "'Reasonable efforts' has been defined as the state's efforts, after intervening to protect a child's health or safety, to resolve the threat to the child before removing the child from the home or to return the child to the home after the threat is removed." *In re I.H.*, 2020-Ohio-4853, ¶ 23 (6th Dist.), citing *In re C.F.*, 2007-Ohio-1104, ¶ 28. However, "[n]o one section of the Revised Code addresses the concept of reasonable efforts." *In re C.F.* at ¶ 29. "Overall, Ohio's child-welfare laws are designed to care for and protect children, 'whenever possible, in a family environment, separating the child from the child's parents only when necessary for the child's welfare or in the interests of public safety.'" *Id.*, quoting R.C. 2151.01(A). "To that end, various sections of the Revised Code refer to the agency's duty to make reasonable efforts to preserve or reunify the family unit." *Id.* In particular, under R.C. 2151.419, when a trial court

> removes a child from the child's home or continues the removal of a
> child from the child's home, the court shall determine whether the
> public children services agency . . . has made reasonable efforts to

> prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home.

R.C. 2151.419(A)(1). The Supreme Court of Ohio "determined that the trial court is not obligated, under R.C. 2151.419, to make a determination that the agency used reasonable efforts to reunify the family at the time of the permanent custody hearing *unless* the agency has not established that reasonable efforts have been made prior to the hearing." (Emphasis in original.) *In re N.R.S.*, 2018-Ohio-125, ¶ 25 (3d Dist.), citing *In re C.F.* at ¶ 41, 43 (concluding that the reasonable efforts determination under R.C. 2151.419 does not apply to permanent-custody motions under R.C. 2151.413 or to hearings on such motions under R.C. 2151.414). "[T]he trial court is only obligated to make a determination that the agency has made reasonable efforts to reunify the family at 'adjudicatory, emergency, detention, and temporary-disposition hearings, and dispositional hearings for abused, neglected, or dependent children, all of which occur prior to a decision transferring permanent custody to the state.'" *In re B.S.*, 2015-Ohio-4805, ¶ 36 (3d Dist.), quoting *In re C.F.* at ¶ 41.

{¶51} Here, the record reflects that the trial court made the requisite reasonable efforts findings at various stages of the proceedings prior to the permanent custody hearing. Thus, the trial court was not required to make a further reasonable efforts finding at the permanent custody hearing. *Accord In re W.J.*, 2022-Ohio-2449, at ¶ 87 (3d Dist.). Nonetheless, the trial court did so. Specifically,

the trial court found that the agency engaged in reasonable efforts by providing regular visitation opportunities (even adjusting for the parents' no-contact order), preparing and modifying numerous case plans, communicating regarding case plan completion, and providing tangible assistance such as service referrals, dumpsters, gas cards, and a hotel stay. The trial court also highlighted the agency's efforts to identify kinship placements.

{¶52} On appeal, Christopher argues that the trial court abused its discretion by concluding that the agency made reasonable efforts toward reunification because the agency's efforts were not sufficiently tailored, timely, or adaptive to his specific circumstances. In particular, he contends that the agency failed to meaningfully accommodate his learning disability—particularly his struggles with reading and writing—and failed to provide concrete, disability-compatible housing assistance beyond simply handing him lists of resources. Furthermore, Christopher asserts that the agency improperly discounted his 2025 sobriety, unreasonably suspended his visitations based on strict administrative "no-call/no-show" rules without providing reasonable accommodations, and failed to conduct updated kinship searches later in the cases.

{¶53} "'Reasonable efforts means that a children's services agency must act diligently and provide services appropriate to the family's need to prevent the child's removal or as a predicate to reunification.'" *In re H.M.K.*, 2013-Ohio-4317, ¶ 95 (3d Dist.), quoting *In re D.A.*, 2012-Ohio-1104, ¶ 30 (6th Dist.). "'In

determining whether the agency made reasonable efforts [pursuant to R.C. §2151.419(A)(1)] to prevent the removal of the child from the home, the issue is not whether the agency could have done more, but whether it did enough to satisfy the reasonableness standard under the statute.'" *In re R.C.*, 2023-Ohio-146, ¶ 29 (5th Dist.), quoting *In re Lewis*, 2003-Ohio-5262, ¶ 16 (4th Dist.). "'"Reasonable efforts" does not mean all available efforts.'" *Id.*, quoting *In re Lewis* at ¶ 16. "A 'reasonable effort' is 'an honest, purposeful effort, free of malice and the design to defraud or to seek an unconscionable advantage.'" *Id.*, quoting *In re Weaver*, 79 Ohio App.3d 59, 63 (12th Dist. 1992). When assessing "'whether reasonable efforts were made, the child's health and safety is paramount.'" *In re A.M.*, 2015-Ohio-2740, ¶ 25 (3d Dist.), quoting *In re T.S.*, 2015-Ohio-1184, ¶ 27 (3d Dist.), citing R.C. 2151.419(A)(1).

{¶54} "'"Case plans are the tools that child protective service agencies use to facilitate the reunification of families who . . . have been temporarily separated."'" *Id.*, quoting *In re T.S.* at ¶ 26, quoting *In re Evans*, 2001 Ohio App. LEXIS 4809, *7 (3d Dist. Oct. 30, 2001). "'To that end, case plans establish individualized concerns and goals, along with the steps that the parties and the agency can take to achieve reunification.'" *Id.*, quoting *In re T.S.* at ¶ 27. The agency is required to demonstrate that it developed and facilitated a plan to "account for the respective abilities of the parents and children in pursuing individualized concerns, goals, and steps necessary for reunification." *In re Leveck*, 2003-Ohio-

1269, at ¶ 10 (3d Dist.). "'Agencies have an affirmative duty to diligently pursue efforts to achieve the goals in the case plan.'" *Id.*, quoting *In re T.S.* at ¶ 27. "'"Nevertheless, the issue is not whether there was anything more that [the agency] could have done, but whether the [agency's] case planning and efforts were reasonable and diligent under the circumstances of this case."'" *Id.*, quoting *In re T.S.* at ¶ 27, quoting *In re Leveck* at ¶ 10.

{¶55} Based on our review of the record in these cases, we conclude that the trial court did not abuse its discretion by determining that the agency's reunification efforts with Christopher were reasonable. Decisively, the record reflects that the agency's efforts were consistently undermined by Christopher's own choices and repetitive criminal conduct. *Compare In re L.C.*, 2024-Ohio-283, ¶ 83 (6th Dist.).

{¶56} Importantly, even though Christopher contends the agency failed to tailor its services to accommodate his reading and writing struggles, there is no evidence in the record that the agency failed to instruct or assist Christopher in a manner commensurate with his cognitive abilities. *Compare Ine re A.M.* at ¶ 15; *In re D.R.*, 2018-Ohio-3434, ¶ 79. To the contrary, the record demonstrates that he successfully completed numerous case plan programs. Ultimately, the record reflects that much of his lack of progress stemmed from an inability to implement the lessons that he learned, rather than an unaccommodated cognitive barrier.

{¶57} Moreover, the balance of Christopher's complaints about the agency's efforts are undermined by the hallmark of the statute—that the agency need only

make *reasonable* efforts, not exhaust every conceivable option. Indeed, the record reflects that the agency provided reasonable housing assistance by providing resource lists, referrals, a dumpster to clean out a previous apartment, rent assistance, and gas cards. Christopher's argument that the agency should have provided concrete housing placement demands more than the statute requires, particularly when his own housing instability was driven by his repeated evictions and extensive periods of incarceration. *See In re E.B.*, 2025-Ohio-1999, ¶ 46 (10th Dist.).

{¶58} Similarly, Christopher's complaints regarding the agency's visitation protocols and its assessment of his recent sobriety simply ask this court to impose obligations beyond what was reasonable given circumstances that he created. Importantly, the trial court could reasonably view the agency's visitation confirmation requirement as a common-sense safeguard for young children who were traveling more than two hours for visits, and as a measured response to missed visits. Just as importantly, the record supports that Christopher's missed visits and resulting suspensions were largely driven by his own unavailability—most notably, as a result of periods of confinement—rather than agency indifference or rigidity.

{¶59} Likewise, the trial court was entitled to weigh the context of Christopher's sobriety—occurring largely while incarcerated or in a highly structured setting—against his broader history of substance abuse. Reasonable efforts do not require the agency to treat late-breaking, controlled-environment

sobriety as dispositive, especially when the case history supports concern about relapse once structure is removed. *See In re K.C.*, 2025-Ohio-1110, ¶ 31 (5th Dist.).

{¶60} Finally, Christopher argues the agency should have conducted updated kinship searches later in the case. However, reasonable efforts do not obligate an agency to conduct kinship searches indefinitely to chase speculative possibilities, particularly where the record otherwise supports that the agency pursued reunification services and permanency planning in a reasonable manner, which it did. *See In re J.H.*, 2019-Ohio-5184, ¶ 55-58 (5th Dist.).

{¶61} Taken together, Christopher's complaints amount to a demand for ideal services and perfect outcomes, not a showing that the trial court acted unreasonably, arbitrarily, or unconscionably in concluding that the agency employed reasonable efforts. Therefore, since the agency provided sustained, practical assistance and Christopher's progress was repeatedly undermined by his own conduct and instability, the trial court did not abuse its discretion by concluding that the agency's reunification efforts were reasonable.

{¶62} Accordingly, Christopher's third assignment of error is overruled.

{¶63} Having found no error prejudicial to the appellants herein in the particulars assigned and argued, we affirm the judgments of the trial court.

***Judgments Affirmed***

**WILLAMOWSKI and WALDICK, J.J., concur.**

# **JUDGMENT ENTRY**

For the reasons stated in the opinion of this Court, the assignments of error are overruled and it is the judgments and order of this Court that the judgments of the trial court are affirmed with costs assessed to Appellants for which judgment is hereby rendered. The causes are hereby remanded to the trial court for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket. See App.R. 30.

William R. Zimmerman, Judge

John R. Willamowski, Judge

Juergen A. Waldick, Judge

DATED:
/hls